Mr. Aberle. Court-appointed counsel for Louis Carbins. We're here today to discuss whether sufficient evidence supports the jury's verdict on Count 9 for aggravated identity thefts. That verdict, by statutory mandate, added two years to the sentence imposed on the other eight counts. Now, the government in this case did prove identity theft was committed by Doc, that mysterious online apparently foreign entity who, in this case, managed to get a hold of the Social Security numbers and names of ten couples who live in various places in the United States and used those names and Social Security numbers to fill out electronic 1040 tax forms requesting refunds of approximately $8,000 apiece. How and when he obtained those means of identification is completely unknown. He then e-filed those forms between February 26th and April 10th of 2013. But before filing the first form, he recruited Lafrida Watts, the state's key witness, who in turn recruited the appellant, Mr. Carbins, to open up bank accounts so that Doc could deposit those tax refunds. Mr. Carbins and Ms. Watts would then withdraw the money and wire Doc's share to somewhere in Eastern Europe. The problem in this case is that the government presented no evidence establishing that when Mr. Carbins agreed to enter into this arrangement that he had any knowledge that the source of this money was through the commission of identity theft. In fact, the only evidence presented on the issue of knowledge in this regard is Lafrida Watts's testimony, who said that she and Mr. Carbins simply did not know the source of the money. They assumed it was perhaps drug money that was owed to Mr. Carbins. They got notice, though, a few days in advance before a deposit would hit the bank. Isn't that right? Yes. With respect to most of the deposits, they would get a notice from Doc. And they had access online to that information? Well, Doc would send them presumably texts or e-mails. I mean, he had access to his own account, and he could look and see what was going on in the account. Sure. So when he got a notice from Doc that the deposit was going to hit within a couple of days, they would check online to see when it hit so they'd know when to withdraw money. Well, from what I understand, when he didn't need to check online, when money hit that bank, the bank sent them notification. But wouldn't it have been human nature for them to be interested in when that money was going to hit the bank so they'd check it, keep checking that bank account online to see when the money was going to hit? Well, I'm not sure of that. If the deal, as apparently it was, was to wait for Doc to send notification, then maybe that's what they did. But I'm not sure in this case why that's going to matter too much. Well, they did eventually see what the deposit said, didn't they? I think on several of them it said refund U.S. Treasury Department tax refund and give the name of the taxpayer. Well, here's what the evidence was. There were bank statements, written bank statements, the ones that were sent in the mail to Mr. Carbons, that one of the entries was the deposit with the coding on it. That wasn't also available online? I mean, what I get in the mail is the same as what's online. Assume so. Okay. There's no evidence that – well, first of all, there's no evidence when these statements were sent, there's no evidence that when he received them that he ever looked at them, that he ever got online. Again, we're not sure that's too important a point. Furthermore – Even if all that can be inferred that he did look and see that these were tax refunds in Joe Smith's name or whoever it was, then there still needed to be some more inferences that he knew they were not authorized using that person's name. Correct. And just to be clear, what they said was U.S. Treasury 312 tax REF Gowdy, David Ampersand. I mean, that's, according to the government, is information sufficient to let him know that these were tax refunds from 1040 tax forms filed in these people's names, and we would argue that there's a bit of belief there. What would you think it would mean if you saw that, tax REF and give a person's name? What would you think that meant? Well, it's not clear that it is a person's name. I mean, David is a name, Gowdy. It's true. One of them is white, comma, Forrest Ampersand Marie. It sounds like a law firm. But, again, there's no question. Well, let's just jump to April 25th. On April 25th, the bank vice president of the Patterson Bank says, Mr. Carpenter, you've got a tax refund in here that doesn't belong to you. Okay, so we accept that he gets information that this is IRS-related money. The problem is, is that that information is not sufficient to prove that he knew that these were tax refunds created through the commission of aggravated identity theft. What's missing from that? I mean, they know the doc is running a scam, and he's getting money sent to the bank account. And then, in addition, they see that it came from the IRS and it had the person's name. What's missing? Well, he has to know. He has to know that – well, let's think of what he could think. Doc is a clever fellow. He has created – he has taken legitimately filed tax returns and somehow had the refunds redirected into Carpenter's account. Or the names on those tax forms are not of real people. Or they were real people who were co-conspirators. So he has to know that these names were real people and that they were used without those persons' authorization. And our position is that you just can't get there from this information. Well, I mean, he knows that this money is coming in that is coming from the IRS. It seems like he would have to know that. They're running the scam, and this is who's sending the deposit to the bank, and then it has the person's name. Why wouldn't it be perfectly logical to think that was a tax refund for that person? But, again, he has to – certainly that is a possibility if he thought of that. But as I say, there are so many other possibilities. You have to prove that he knew that these were tax refunds and that they were real people. And you circumstantial evidence can prove that, can't you? Yes. But he – no, he's looking at a designation that I just mentioned. He doesn't actually know that these were – how that money got there. He doesn't even know it's tax forms that were filed. And I said he could have – Doc could have simply somehow arranged for someone else's tax returns to be deposited in this man's account. I mean that is just as likely as anything else. I mean the government says it's common knowledge that you can't get a refund from the government unless the Social Security numbers are real. But is that common knowledge? I mean we already know from this case that the government will send money without checking the W-2s, at least not until later. And, again, he didn't have the tax forms in front of him. He didn't have access to those tax forms. So he didn't see them. He didn't see the names other than the cryptic notations in these bank statements. And as to the government's contention that it's deliberate indifference – that's a different concept – deliberate ignorance, he couldn't have blindly closed his eyes to something if he had – he would otherwise have alerted him to the fact that this was – because, like I said, he doesn't even – he doesn't have these forms in front of him. He doesn't know – at best he can only suspect that they're using these forms. But our additional argument is that there's no evidence that he had this knowledge until – at least until deposits were made. Then it's too late, we would argue, under Rosemont. Well, but there were multiple deposits. So after he saw the first one or two, he would have all the knowledge he's going to have, didn't he? I mean why is it too late if the scam is still going on? Well, because Rosemont says you have to have advance notice such that it wasn't reasonable for you to withdraw. And our argument is that Doc has already committed aggravated identity theft. There's nothing that Mr. Carbons can do about that. So when he commits himself to the fraud and to the theft of government money, he does so without the intent to further the crime of identity theft. Well, he's assisting Doc in setting up the deposit so the money can go in the deposit. He is definitely doing that, but he's not – he is not – he has – the knowledge element goes to not whether he – it goes to whether he intended to facilitate Doc's commission of identity theft. Well, Doc couldn't do this without him or somebody like him. That's correct. But look at it as like – in Rosemont they give the example of a defendant charged with using a gun in relation to a drug trafficking crime. He goes to the drug deal. He sees that his partner has got a gun in his pocket, and he decides, hmm, that wasn't what I bargained for, but I'm going to go through with this. And that's sort of what we have here. And the Supreme Court indicates that in that case, the decision to not withdraw, which may be motivated by – it's not a reasonable thing to do at the time. It could be – in fact, it could be a dangerous thing to do at the time. But his decision to go forward does not evince an intent from the beginning to aid in that particular crime of possessing a firearm during the commission of offense. Well, after Doc saw the first check, if he did infer that this was an IRS refund, he certainly could walk away after he saw that, couldn't he, and not participate in any further deposits. Sure. He could have, yes. But the example that the court gives in Rosamond would make no sense. If the Supreme Court would then hold – well, he didn't withdraw at that time because it wasn't a reasonable thing to do. Therefore, he wasn't guilty of the larger crime. But now that he's gone home and split the proceeds, now he is guilty. I mean that would be kind of the logic of saying that because he doesn't withdraw after learning about it. He knew about it from the beginning. I mean I think Rosamond says you have to know about it from the beginning. But what you do afterwards, just like flight can be evidence of your intent, what you do afterwards can be – because if you really thought, oh my god, I didn't know this, and he's stealing Social Security numbers, I don't want to have anything to do with that. That's what a truly innocent person would do. So I mean doesn't the law generally recognize that what you do – continue to do after the fact can be evidence of your intent before? Yes, but not in this case. That's not a reasonable conclusion in this case. The government makes that argument. Well, you're saying it wouldn't be a reasonable conclusion. You're not challenging the theft convictions. Oh, absolutely not. Right. This is the guy who finds out that, oh gosh, look where this money is coming from. Well, I'm going to spend it anyway. It's like the government makes that argument, and we think the logic is equivalent to this. You find a suitcase full of money on the side of the road. You take it. You keep it. Then you find out from the news that, oh, this was the subject of a bank robbery. And with that knowledge, you go ahead and you spend that money. Under the government's logic, that decision to spend that money would raise a reasonable inference that when you found that case and kept it, you knew it was bank robbery money. And we would say, no, that does not apply, not in this case. And that's the same. Yeah, but there was an innocent potential that could have just been money in a suitcase, and you just have sort of like a dollar on the street. Not that I take those, but you don't view it as theft necessarily if there's a dollar lying around on the street and pick it up. Whereas here he knows he's stealing from someone, and now he finds out, in your view, who, and that it is a who and not just the big old government but that it is a person, Social Security, whatever, doesn't make a lick of difference to him. Isn't that some evidence that he knew that all along? Well, it's evidence that he knew there was a crime being committed. We don't suspect it. And the guy who finds the suitcase may have been innocent. Our argument is that Mr. Carbons was innocent of aggravated identity theft but not, of course, agreeing to defraud the government. So that's how the analogy works. He is innocent of the bigger crime, and he remains innocent of the bigger crime. That doesn't change by the fact that he decides to take that money and spend it. Let me ask you this. Yes. Just accept from my question the fact that he could have inferred when he saw that first deposit and second deposit that this was an IRS refund to the named person that was named in the deposit. Now, isn't that enough evidence to show that he knowingly participated and assisted in identity theft? We would argue no. Just like the defendant in Flores-Figueroa, you could make the same argument that he should have known that if he's got a Social Security number on that card that it belonged to somebody. All he has to know is the name was used in an unauthorized way, and you've got a name. Right. But he has to know that that name was of a real person. That's right. Why would he know that? And then he has to know that the name was not a conspirator. It has to be an unauthorized use of the name. In other words, the two guys, Doc and his friend, he uses his friend's name in Social Security. But that would not be identity theft. So we can't attribute that knowledge to Mr. Carbons in this case. That's all right. Thank you. Thank you. You've reserved time for rebuttal. Ms. Paulson? Ms. Paulson? May it please the Court. Caitlin Paulson for the United States. Evidence presented in the government's case in chief is sufficient to uphold a conviction under Section 1028A. This evidence includes the bank account. The bank account transactions. The text and e-mail notifications. And direct testimony from a co-conspirator. Now, I think in order to establish knowledge in this case, it's important to- Did the text notifications include the reference that had the person's name? Your Honor, the texts were not admitted into evidence. However, there is overwhelming support that Carbons did upon receiving those text messages. Access his online bank accounts and review the actual transactions. What's the evidence for that? So the evidence for that is the direct testimony from Ms. Watts, his co-conspirator, who testified that he would access his bank accounts upon receiving those text and e-mail notifications. It was also the e-mails received from Dock which specified how Carbons was to access and essentially dole out the money that was then deposited into the bank account. So at this point, this was basically the defendant's job. He was responsible for opening up his bank account and then adhering to Dock's determinations on how to withdraw the funds and divvy them up. So she testified that when he got the message from Dock that a deposit was going to hit within a couple of days, he would then access his account to find out when it hit or what? I believe Ms. Watts' testimony stated that upon receiving text notifications that deposits had been made to his account, I believe coming from the bank itself, he would then access his online account. And I believe that reference can be found in the record at 380 to 381. It's also important to note that in these banks— But she never says then after he saw that there was any mention of the fact that, oh, this is a tax refund, this is a person's name. That's correct. She does not state that in her testimony. But it's important to note that the first two tax refunds were submitted February 26, 2013. A little more than a week later, the initial deposits were placed in Carbons' bank accounts, and these are the two deposits that specify the individual's names who had their identity stolen, the Gowdys and the Whites. So in both of those bank deposits, it includes the fact that the deposit was coming from the IRS, coming from the U.S. Treasury, that it was a tax refund, and then it included the names of the individuals whose identity had been stolen. So at that point, Carbons had knowledge or noticed that the funds were coming from the IRS. And this is a point where we look to the Rosemond for knowledge. Now, my opponent suggested that knowledge has to begin at the start of a scheme. In effect, Rosemond said that in order to be an accomplice, you have to have foreknowledge, which means that you have to have knowledge at a time where you can do something, most notably walk away. So I would suggest that at this point, when two bank deposits had been made into Carbons' various bank accounts that said that it was coming from the IRS that stated specific individuals' names, he had the opportunity to walk away. He had the opportunity to prevent Dock from using his bank accounts. He had the opportunity to inform the IRS that funds were being— I mean, I don't think there's any doubt about that. But there are more inferences that are required, right? And maybe they're reasonable ones. But, okay, let's assume he looks and he sees the tax reference and those names. Then he also has to know that those are real people and that they didn't authorize the use of their name, right? So those are the inferential leaps that get you to an aggravated identity theft conviction. That is correct. Now, my opponent has suggested that just because the IRS deposits funds into the account, it doesn't necessarily mean that the IRS knows that this is a real person and that the IRS doesn't check for months to determine whether or not real filings are submitted. It came out at trial that the IRS does immediately verify— I thought he was saying there was no proof his client knew that was IRS policy, though. The issue is whether his client knew that these were not real— or were socials that were accurate socials for these people that were stolen. Correct. So it is the focus on the knowledge of the defendant. At trial, the jury discovered that the IRS immediately reviews names in Social Security accounts, and it is only in the next four to six months that they verify the employment information with the W-2s submitted by the employer. As to carbon-specific knowledge, this court has held, in the past, in the United States v. Dvorak in 2010, which related to a similar identity theft fraud, that this scheme essentially would not work without knowledge that it was real people whose identities were being stolen. Now, in Dvorak, it was a case using Medicaid identification numbers of minors. A chiropractor would use the Medicaid identification number and seek refunds for procedures that he did not perform on these children. Now, in that case, it was a different issue before the court about a jury instruction, which is not present here, but the court recognized that without the existence of real children, the refund that the chiropractor received would not be—the chiropractor would not receive those funds. There are all kinds of tax schemes where the taxpayer themselves is involved in the fraud, where they get a preparer to make up the fake dependents so they can get the earned income tax credit. I mean, there's all types of schemes where taxpayers are complicit with a preparer or someone else in creating false returns that generate fraudulent refunds. So, I mean, that's certainly—why is that not a plausible conclusion? Your Honor, it could be a plausible conclusion. But looking at the standard of review that this court looks at sufficiency claims for jury verdicts, this court looks at the evidence and the inferences in a light most favorable to the jury verdict. Well, I guess the problem is Gowdy and White aren't getting any of the money, so why would they—if they were part of the scheme, they get some sort of kickback from it. They get something out of the money. Here he's just paying Dock, and there's no indication Gowdy and White got any of this money. So that would seem to make it unlikely they were part of the scheme. That's correct. And I'd also like to point out that this specific issue was before the jury. The first claim that—the first argument that the defense counsel brought up in his closing statement was the fact that the defendant did not have knowledge during the time of the tax filings that the identities were being stolen. So the jury had this argument before them. They considered it, and they rejected it when they convicted Carbons on this Count 9. What about the government witness, Watts, who said that they never suspected that this was actual IRS refunds? They thought that Dock could have just—this was part of the scheme. He just made it look like IRS refunds. Yes. So Watts did provide testimony at trial. She said initially neither she nor—she believed Carbons knew that the funds were coming from the IRS. However, Carbons didn't specify as to, as the scheme proceeded, whether Carbons stated that he believed the money was coming from the IRS or not. And so I believe at this point the combination of the deposit statements, which Watts testified that she did not have access to but Carbons did, the text notifications that Carbons received because they were his accounts, and the emails that Carbons received because Dock sent them to Carbons because he was the kind of point man on these accounts, may lead to Carbons having more notice and knowledge as to where these funds were coming from that Watts may not have been—may not have had access to. Unless the Court has any further questions, the government asks for an affirmation on this issue. Thank you. Mr. Aberle, you've saved time for rebuttal. Am I pronouncing your name right? Aberle. Aberle. All right. Thank you. Quickly on the question of knowledge, Ms. Watts testified, and I'm going to quote her, after he met with the detective—this is in April— is, quote, when we actually knew the money was really IRS because from what we understood, Dock could make it look like it was an IRS check. He could say it was an IRS wire or he could say it was a wire from anything, a check or anything. We really thought Dock had that type of capability to do things. I didn't actually think they were IRS checks until he went there and found out that literally it was an IRS check. Also, the government—I couldn't find it— this whole business in April at that time. They don't make the argument that he became aware of it before that. But again, we don't—we rely on— She's certainly arguing that today. I'm sorry? She's arguing that today. Yes, but we very much rely on our principal argument that there was never evidence in this case that he knew that these tax refunds were the product of aggravated identity theft. In the case that the U.S. cites, the Vorak, the guy was a chiropractor. He got the names of actual people. He went around the neighborhood and said, give me some names of people, kids. He then goes to the Medicaid office and says, I need the Medicaid numbers for these kids. And they give him the numbers. So yeah, clearly he can't argue that he didn't know those were real numbers of real kids. That is nothing like what we have here today. It is not common knowledge that the IRS will not issue tax refunds unless the numbers are real. And even so, that doesn't—that does not provide the requisite knowledge to this man who doesn't know that these defendants, that these persons were not co-conspirators, that they were not otherwise legitimately filed tax forms that were somehow funneled into his account. I mean, would it be reasonable for Watts to assume that the IRS would send a refund to some fictitious person, some fictitious—some name who was not a real person? Well, of course, Mr. Watts isn't—in other words, did the jury have— Carbondale. I meant to say Carbondale. Oh, okay, yes. Again, that begs the question as to how that—that he knows how that money got there in the first place. Because even if they are real people, he still doesn't know how those real people— were those real people the victims of identity theft. And, you know, yes, Mr. Gowdy didn't get a kickback, but we know that at trial. But he doesn't know. Well, he knows he's only paying Dock. He doesn't know—he's not paying Gowdy or Wyatt or whatever. Right, and he's— Again, the question is what inferences can you draw. Right. It's rare in a criminal case that you just have absolute proof of every single aspect of intent. Well, right. Because intent is naturally something that people have in their head. Sure. And we would— Circumstantially. The really good case is B. Igliagou, which is unpublished, which I believe we cite. But it should be published. It's got a lot of good information in it. That's the guy who went to PayPal and said, pay James Smith some money. And they did. James Smith was a real person. But he said he didn't know that. And this court reversed his conviction. Okay. Well, thank you. You've used all of your time. Thank you. And, Mr. Averly, you were court appointed, and we appreciate you accepting that appointment. We appreciate both sides' arguments and your cases submitted. And we have concluded for the day.